WILLS—ESTABLISHMENT OF DESTROYED WILL—EVIDENCE.

The requirement that the provisions of a destroyed will must be proved by at least two witnesses (Code Civ. Proc. § 1865) is not complied with by testimony of one witness to such provisions, and to the fact that the will was executed as drawn by a lawyer, the testimony of the lawyer as to the provisions of the will as it was drawn, and that of a witness who saw the will after it was executed, but does not remember all its provisions.

Proceedings for the probate of an alleged destroyed will of George W. Waldron, deceased.

James A. Robson, for proponent.
Maynard N. Clement, special guardian, for infants.
Elihu M. Morse, for Maria L. McMillan and another.
Edwin Hicks, for Charles A. Waldron and others, contestants.

LAPHAM, S. The petitioner is the executor named in the alleged will of George W. Waldron, which the petition states was duly executed by decedent on February 29, 1892, while he was competent, and was afterwards destroyed by him after he had become incompetent, which destruction, it is claimed, amounted in law to a fraudulent destruction of the will in the lifetime of testator. The contestants unite in objections which allege testamentary incapacity in the testator at the date of the alleged will, and assert that, if such will was made, it was procured through fraud and undue influence. The proofs on part of petitioner showed that such an instrument was executed by decedent on the day specified, and was declared by him, in presence of three subscribing witnesses, to be his last will; the only approximate defect in their evidence as to the execution being the failure of two of these witnesses to recollect and so testify positively that they signed at the request of testator. The proofs showed also with sufficient certainty that this instrument was burned by the testator in presence of one Kornbeau, and that such destruction occurred, as Kornbeau recalls it, about

44 N.Y.S.—23

the middle of July, 1893. The evidence respecting the contents of the instrument so executed and destroyed is furnished in part by Mr. Gooding, one of the attesting witnesses, who first made a draft of a will, and submitted it to an attorney, Mr. Andrews, from which draft a new document was prepared by said attorney, and forwarded by mail to said Gooding, and became, Gooding says, the alleged will. The contents of this final draft are given in substance by Mr. Andrews, as well as Mr. Gooding; but the former had nothing further to do with the execution of said instrument, and no personal knowledge of what the will contained after its execution, except as he assumed, on the strength of Gooding's evidence, that the contents of the draft remained unchanged. The only other evidence relating to the contents of the executed instrument came from Miss Dorrance, a legatee under it, it is said, who has waived her right to the legacy, and who testified to the contents of a paper shown her by decedent about the middle of August, 1893, as she states, which paper she says decedent then threatened to burn, declaring that it had been placed in his chest by some one fraudulently, but admitting that the signature of himself to the paper was genuine. The testimony of this witness respecting the contents of the paper so shown her, and the disposing parts of that instrument, agrees, so far as it goes, with the testimony of the witness Gooding in that regard, with the exception that she cannot recall the names of all the residuary legatees, nor state, as he does, that William G. Marble was one of them. It identifies fairly the writing she speaks of with the alleged will of which Gooding testifies, though her evidence that she saw the document in August, 1893, which Kornbeau says was burned in July of that year, throws a degree of discredit on one or the other of these witnesses.

The additional evidence given by proponent in the first instance, before resting, related chiefly to the question of testator's mental condition at the date when he made, and at the date when he destroyed, the alleged will. The counsel for proponent assumed, when he so rested, that Kornbeau was mistaken concerning the latter date, and that Miss Dorrance was correct, and that her evidence, with the evidence of Gooding and Andrews, sufficiently established the contents of the alleged will. These assumptions were opposed by the contestants, who, by their respective counsel, united in a motion for dismissal, upon the grounds that there was not sufficient proof of a due execution of the instrument destroyed, or of Waldron's incompetency at the time he destroyed it, or of the contents of the instrument so destroyed. This assertion that Waldron had not been shown incompetent to destroy the will, coming from those who alleged in their objection that Waldron was incompetent when he made the will, indicated that the question of incompetency in the case was a serious one. The evidence, as it stood, showed primarily that Waldron was competent at the date of the alleged will. But there was grave doubt whether the contents of that instrument had been sufficiently established to meet the requirements of the statute. To pass upon the question of Waldron's

incompetency in July or August, 1893, without first hearing contestants' evidence on the subject of his competency, was unsatisfactory, at least; and to decide the motion upon the remaining ground alone involved the liability of greater expense and more protracted litigation to the estate than would result from denying the motion to dismiss, and putting the contestants to such proof as they might choose to offer on any branch of the case. Without passing definitely, therefore, upon any of the grounds underlying the motion, the application to dismiss was denied at that time, and the evidence of contestants has been received, together with additional evidence on the part of proponent. But no further testimony whatever has been offered touching the contents of the alleged will.

However credible Mr. Andrews is, of whose credibility there is no doubt, he cannot be regarded as an independent witness, at least, to the contents of the instrument as finally executed, but only as a supporting witness to Mr. Gooding respecting the substance of the writing which went into the latter's hands, and which, he says, became the alleged will. The testimony on that subject seems deficient. For example, suppose it were asked whether William G. Marble was named as a residuary legatee in the instrument which Waldron executed. The proponent alleges that he was so named. If he was, that is a fact which the statute requires the proponent to establish. In the absence of a correct copy or draft of the will, he must establish it by the evidence of at least two credible witnesses. Miss Dorrance does not recall and cannot tell whether or not Marble was so named. Andrews cannot know and does not presume to tell of his own knowledge that Marble was so named in the executed will. He does state, from memory, refreshed by another paper he some time drew, and by a letter and draft of a will which Gooding wrote, that, in the draft of a will which he prepared at Gooding's instance, Marble was named as such legatee. But he does not know that such provision was retained in the executed will except by hearsay from Gooding that the draft of a will which was delivered to Gooding by Andrews was adopted and executed by Waldron. Gooding alone, of the three witnesses who have anything to say about the contents of the will, states of his own knowledge that Marble was so named in the will which Waldron executed. The two credible witnesses which the statute requires respecting the contents of a lost will need not necessarily have been witnesses also to the execution of the will. But it is reasonable to read the statute as meaning that they must both be able to speak of an actual will from personal knowledge, and not of a possible will. The execution of a will and the contents of a will are distinct facts, as counsel suggest. If, after Mr. Waldron had executed the alleged will, Mr. Gooding had taken it to Mr. Andrews, and these two men had possessed themselves of its contents, and could now fully recall and give those contents in evidence, they would be the credible witnesses required. If two reliable persons had become possessed of the contents without the

intervention of Mr. Gooding, and without any part in the execution of the instrument, they might equally well constitute such witnesses. But could they be such witnesses if their knowledge of the contents of the instrument was limited to what they supposed or believed it contained, only because somebody had told them that a draft they had seen, of a will, had been executed afterwards, and had become a will? That is the position Mr. Andrews holds in this case. It is not enough. Code, §§ 1865, 2621; McNally v. Brown, 5 Redf. 372; Collyer v. Collyer, 4 Dem. Sur. 53; Sheridan v. Houghton, 6 Abb. N. C. 234.

What must be looked for here is not merely assurance of a fact, but compliance with a statute. If the former were all, the evidence of Mr. Gooding would suffice. But additional proof of the contents was necessary. Therein the proponent fails. He fails also in his proof of Waldron's incompetency at the time of destroying the will. The burden of that proof was on the proponent. He alleged and showed that Waldron was competent when he made that will. The contestants, in the objections they filed, denied that fact. But the evidence they presented was aimed to show that Waldron was never otherwise than competent. The case therefore stands with the fact of Waldron's testamentary capacity in February, 1892, not only proved, as it had to be, but conceded as well. The same mental condition is required in a testator for a valid destruction as for a valid execution of his will. Had the competent Waldron in 1892 become an incompetent Waldron in 1893? With but 18 months, at most, between the valid making and the alleged invalid burning of his will, one might expect decisive proof of his sudden decline. It is not found in the evidence. To be sure, he was on the downgrade of life, and nearing the terminal station; but his daily conduct apparently had not essentially changed, barring a few occasions or occurrences easily attributable to medicines or liquor, in which he sometimes indulged. This testator, when he burned the will, had reached the age when infirmities usually come to men. They had come to him. He was feeble, forgetful, garrulous, suspicious, but the people around about who knew him still dealt with him. He loaned them money. He receipted for payments. He bought provisions. He settled bills. He paid his taxes. He cared for himself. He kept a horse. He drove when he pleased. He transacted business generally as an old man in humble station, with few wants and fewer friends, would naturally do. The idea that his conduct was commonly irrational is, confessedly, an afterthought of witnesses who would be most apt to think it. He had an abiding purpose, frequently expressed, of destroying the will which he did destroy. That he had become incapable of making a valid will when he burned the will in question is not a necessary conclusion or a reasonable inference from the evidence of his relatives and everyday acquaintances who furnished the bulk of testimony pro and con. For positive information, recourse is had to his doctor. It must be said there is something repugnant in the way which ordinary

physicians have of tossing off opinions regarding the mental state of a fellowman. With only the slimmest opportunity for observation or experience, these medical gentlemen remand their patient to the realm of the insane, or pronounce him lacking in capacity to make a will. Here we have a rural doctor, who had prescribed for Waldron once in September, 1892, once in January, 1893, once in June, 1893, and once in February, 1894, and never once besides, testifying directly, on the strength of knowledge thus acquired, that Waldron did not possess testamentary capacity in January, 1893, or at any time thereafter; and this opinion, concurred in partly by another doctor, whose means of knowledge were even less, proponent's counsel argues, must be accepted as conclusive. There is no rule in law, or common usage, or interprofessional courtesy which compels or justifies such subservience to a dictum of these gentlemen of the medical calling. How unsafe this would be is evident from the idea of "testamentary capacity," as he understood it, which was dropped by Dr. Burrell, the doctor so facile princeps in matters pertaining to mental disorders. This doctor had never treated Waldron. His examination was conducted in the hypothetical method. He was proponent's witness. He was called to show Waldron's incompetency. The questions put to him by proponent's counsel carefully excluded all specimens of Waldron's conversations and conduct which could fairly point to a different opinion. Of these selected specimens, scarcely one by itself, the doctor says, would be indicative of mental decline below the will-making power. They must all be grouped together, he says, before they can support an inference of such incapacity. No fault is found with the method. But what opinion Dr. Burrell would have expressed in response to one hypothetical question embracing all facts related by other witnesses concerning Waldron is quite evident in his response to·questions put by contestants' counsel. He would hardly have pronounced Waldron incompetent without giving him the benefit of a doubt. And the same is true of the other physicians who were examined by the same method. The conclusion from all the evidence is that Waldron was competent to make a will in July and August, 1893, and that his burning the will was a valid revocation of it.

Findings of fact and conclusions of law will be filed accordingly, and a decree denying admission of the alleged will to probate will be entered, upon proper notice to the special guardian and to counsel for proponent. Decreed accordingly.